**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**Civil Action No.:  3:24-cv-000834**

|  |  |
|---|---|
| RVO Health, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>KEENAN KLINGER,<br><br>        Defendant, | **AMENDED COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

Plaintiff RVO Health, LLC ("**RVOH**"), by and through undersigned counsel, for its Complaint against Defendant Keenan Klinger ("**Klinger**" or "**Defendant**") hereby alleges and states as follows:

## INTRODUCTION

1.      Klinger signed a Confidentiality and Non-compete Agreement with RBUS, Inc. ("RBUS") with an effective date of August 30, 2021 (the **"Non-Compete Agreement"**). A copy of the Non-Compete Agreement is attached hereto as <u>Exhibit A</u>.

2.      Klinger signed the Non-Compete Agreement in exchange for an offer of employment as Senior VP of Commercialization, a substantial salary and bonus, and a grant of RBUS's parent company's profits units. RVOH contends Klinger breached the terms of the Non-Compete Agreement, including the confidentiality provision therein.

3.      Klinger also agreed to restrictive covenants, including non-competition and confidentiality restrictions, in exchange for a grant of options in the Option Award Agreement dated June 27, 2022, between Klinger and RVOH (the **"Award Agreement"**).

1

4.      Klinger has spent the last fourteen (14) years working for the company Health Grades, Inc., and its successor companies, which maintains the web platform *heathgrades.com* (collectively "**Healthgrades**"). Healthgrades helps consumers find the right doctors, hospitals, and care, and allows healthcare professionals and health systems to connect with patients. It also serves as an advertising platform for pharmaceutical and other healthcare companies.

5.      Klinger most recently acted as RVOH's Senior Vice President and General Manager, Life Sciences and served on RVOH's Executive Leadership Team. During the last twelve (12) months, Klinger led RVOH products and business and implemented go- to-market strategies that were instrumental to Healthgrades' and RVOH's growth and profitability.

6.      On June 14, 2024, Klinger informed RVOH of his intention to resign and worked with RVOH on a mutual separation to be effective on August 13, 2024.

7.      Klinger's last physical day at work for RVOH was August 9, 2024. Just four (4) days earlier, on August 5, 2024, Klinger downloaded a confidential and proprietary 50+ page PowerPoint sales pitch deck which captures more than a decade of Healthgrades' strategy (the "**Proprietary Sales Tool**"). Accordingly, Klinger had access to confidential, proprietary RVOH information in the days leading up to his departure. Further, on August 9, 2024, Klinger viewed two additional slide decks entitled Patient Services Pipeline and Transition ("**Patient Services**") and 8.20 BOD Slide Outline ("**BOD Slide Outline**"). Klinger was not tasked with providing input or drafting the BOD Slide Outline slide deck. All three of these slide decks included confidential, proprietary RVOH information.

8.      RVOH recently discovered that Klinger is now employed in an executive role by Everyday Health, Inc. ("**Everyday** Health"), a direct competitor of RVOH and its Healthgrades business, in direct violation of his restrictive covenants with RVOH.

9. While employed by RVOH, Klinger was responsible for and was privy to RVOH's strategic plans, financial position, marketing models, potential acquisition targets and strategic partnerships, and trade secrets and other confidential information, and he developed close and important relationships with RVOH's key clients, including, among other things, knowledge of their contract terms, pricing, business plans. RVOH's clients include pharmaceutical companies, healthcare professionals, health systems, and advertising agencies that place advertisements with RVOH on their behalf. Klinger is now in a position to use RVOH's confidential and trade secret information and its business relationships to unfairly compete with RVOH at Everyday Health, which would cause irreparable harm to RVOH unless enjoined by the Court.

## The Parties

**RVO Health**

10. RVOH is a Delaware Limited Liability Company with its principal place of business at 1101 Red Ventures Drive, Fort Mill, South Carolina 29707.

11. RVOH maintains a portfolio of industry-leading websites, products, and services that seek to improve every part of the public's health and wellness journey.

12. RVOH was launched in 2022 as a joint venture between New Imagitas, Inc (referred to herein as "Red Ventures") and UnitedHealth Group Incorporated ("UHG"). RVOH owns and operates the Healthgrades.com platform and several other brands and websites.

13. Through its brands, RVOH publishes articles and other content about various health and wellness topics. Healthgrades has more than one hundred (100) million users in all fifty (50) states and has data on more than three (3) million U.S. healthcare professionals in all fifty (50) states.

14. Healthgrades is a well-known and widely used platform that allows consumers, including prospective patients, to find a healthcare professional or healthcare facility. Consumers

search for top-rated doctors and hospitals, read reviews from other patients, and even book appointments on-line.

15.     Healthgrades also enables healthcare professionals and facilities to manage their online reputation and to showcase their profiles, experience, and qualifications to attract patients. This includes the Healthgrades Professional platform (known as Healthgrades Pro), a dedicated resource for specialty-specific clinical news, customized articles, and consumer insights for healthcare professionals.

16.     The Healthgrades website does not generate fees or other revenue from consumers or patients, but primarily through advertising by healthcare, life sciences, pharmaceutical, and other businesses.

**How Healthgrades became RVOH**

17.     Healthgrades' business launched in 1998 as the first comprehensive physician comparison database. Healthgrades has maintained a highly regarded reputation in the industry and is known as one of the leading sites Americans use to find a healthcare professional.

18.     Red Ventures, LLC and RBUS are wholly-owned, indirect subsidiaries of Red Ventures Holdco, LP, a Delaware Limited Partnership (collectively, "**Red Ventures**") and are North Carolina corporations with their principal places of business at 1423 Red Ventures, Dr., Fort Mill, SC 29707. Red Ventures is a digital advertising and performance marketing partner to leading brands and owns a portfolio of digital media brands. Red Ventures acquired Healthgrades in 2021.

19.     RBUS employed Klinger until it transferred his employment to its wholly-owned subsidiary, Health Payroll Services, LLC ("Health Payroll Services"), on or about December 27, 2021. Then, on January 1, 2023, RBUS sold all its interests in Health Payroll Services to RVOH.

20.     RVOH owns and operates Health Payroll Services as a subsidiary, and employed Klinger at all relevant times, including through August 13, 2024.

21.     On September 26, 2024, RBUS memorialized its assignment of its employment agreements with the Health Payroll employees to RVOH effective as of January 1, 2023.

22.     Everyday Health Group is a Delaware corporation with its headquarters at 345 Hudson Street, 16th floor, New York, NY 10014.

23.     Upon information and belief, Everyday Health is a wholly owned subsidiary of Ziff Davis, Inc. ("Ziff Davis"). Ziff Davis is a publicly-traded digital media and internet company also based in New York City, whose portfolio includes brands in, among other things, health and wellness.

24.     Everyday Health operates a website (everydayhealth.com) with a "Find a Doctor" feature along with publication of articles and content related to health, wellness, and self-care. Everyday Health competes directly with Healthgrades for users, health professionals and health systems, and advertisers. Upon information and belief, like Healthgrades, Everyday Health currently relies on advertising for its primary source of revenue.

25.     Everyday Health also operates a website (medpagetoday.com) which provides healthcare professional news and information, and which also directly competes with RVOH's healthcare professional products, including Healthgrades Professional.

26.     Everyday Health recently announced that Klinger was its new Executive Vice President and General Manager of Everyday Health Professional, a business that competes with Healthgrades.

**Keenan Klinger**

27.     Klinger is a resident and citizen of the State of Georgia with his home residence

at 1440 Grant Drive, N.E., Brookhaven, GA 30319.

28. Klinger commenced his employment with a predecessor to Healthgrades in August of 2010 as Director of Strategic Development.

29. During Klinger's tenure with Healthgrades and its related entities, he advanced his career and held the following titles: Sr. Director, Strategic Development (January 2013 – March 2015); Vice President and General Manager, Elective Provider Business (April 2015 – December 2017); Vice President of Business Development (January 2017 –December 2019); Senior VP and General Manager, Life Sciences (December 2019 –August 2021); and Senior VP, Commercialization (August 2021 – January 2023).

30. Throughout Klinger's various roles at Healthgrades, Klinger engaged in corporate strategy and growth; deepened RVOH's relationships with strategic partners, clients, and advertising agencies; understood client business goals; participated in strategic planning and execution, resource allocation, and profit and loss management; and created products and marketing solutions for Healthgrades' pharmaceutical clients and other partners.

31. Klinger served as the General Manager for the Healthgrades Life Sciences team until February 2024, when RVOH restructured and eliminated the General Manager position and transitioned Klinger into a similar role as Senior Vice President of Business Development & Platform Strategy.

32. In this role, Klinger reported to RVOH's President of Medicare, Media & Life Sciences, and was responsible for understanding, integrating, and developing business strategies across all of RVOH, with a heavy focus on the Healthgrades business unit, including pharmaceutical offerings for direct-to-consumer ("**DTC**") and healthcare professional ("**HCP**") marketing, asynchronous care, data products, Healthline, Optum Perks, prevention, among other

things.

33.     Klinger provided his intention to resign from RVOH on June 14, 2024, and his last day of employment was August 13, 2024.

34.     In connection with his departure, Klinger signed a separation agreement (the **"Separation Agreement"**) with RVOH on August 14, 2024, in which he acknowledged and committed to abide by his restrictive covenants. He also acknowledged that his restrictive covenant agreements survived and were not superseded by the Separation Agreement.

35.     Upon information and belief, Klinger joined Everyday Health in mid- or late August 2024.

<u>**Jurisdiction and Venue**</u>

36.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship. Klinger is a resident of Georgia and neither RVOH nor any of its members or the member of its owner-entities is a citizen of Georgia.

37.     The District Court for the Western District of North Carolina is the appropriate venue for this case because, pursuant to 28 U.S.C. § 1391, a substantial part of the events giving rise to RVOH's claims occurred in this District and because Klinger's Non-Compete Agreement states he will "hereby irrevocably consent to the exclusive jurisdictions of the state and federal courts with jurisdiction over Mecklenburg County, North Carolina, for any litigation which may arise out of this Agreement." The Non- Compete Agreement further states that "[b]oth [he] and Red Ventures waive any objection based on *forum non-conveniens* or any objection to venue of any such action."

7

## Factual Allegations

**The Non-Compete Agreement**

38.     Klinger and RBUS, by their mutual assent, entered into the Non-Compete Agreement, whereby RBUS agreed to hire and to compensate Klinger, and in exchange, Klinger agreed that he would not, among other things, compete against "Red Ventures" (as defined therein and including, without limitation, RBUS) for a period of twelve (12) months following the termination of his employment.

39.     Klinger signed the Non-Compete Agreement on August 14, 2021.

40.     Section 3 of the Non-Compete Agreement states in pertinent part: From and after the Start Date and for the duration of the Restricted Period,

> you may not, directly (or by indirect action through another person or entity that you direct or control), engage in Competitive Activity on behalf of a Client or Competitor, within the United States of America.
>
> (a)    For the purposes of this Agreement, "***Restricted Period***" means the period of one full year (12 calendar months) following the termination of your employment, regardless of the timing, cause, or manner of termination.
>
> (b)    For the purposes of this Agreement, "***Competitive Activity***" means any employment or engagement (other than on behalf of Red Ventures) in which you are: (1) performing services for a Competitor or Client that are the same as or substantially similar to the job duties you performed for Red Ventures during the preceding 24 months and (2) working for that Competitor or Client in the same or substantially similar line(s) of business(es) as you supported while working for Red Ventures during the preceding 24 months (e.g. a business line marketing the same or substantially similar products or services as you marketed for Red Ventures during the preceding 24 months).
>
>    ***
>
> (d)    For the purposes of this Agreement, "***Competitor***" means any business entity that: (1) competes directly with the Business, including but not limited to, with one or more of the Red Ventures' brands; or (2) competes with Red Ventures in providing services that are the same or substantially similar to the services Red Ventures provides in the product or service lines it serves.

Exhibit A, Section 3.

41.     The Non-Compete Agreement also contains an agreement not to disclose confidential information that states, in pertinent part:

> (a)     At all times from the Effective Date during your engagement or employment with Red Ventures and thereafter until the information in question is no longer confidential, you shall maintain the confidentiality of all Confidential Information (as defined below) you receive, have access to, use, develop, or otherwise discover. You shall use such Confidential Information only for the advancement of the interests of Red Ventures, and you shall not disclose, use or rely upon any Confidential Information for your own benefit or for the benefit of any person or entity other than Red Ventures.

Exhibit A, Section 2.

42.     The Non-Compete Agreement is supported by adequate consideration, including an offer of employment, a substantial salary and target bonus, and a grant of profits units.

43.     The Non-Compete Agreement is governed by North Carolina law.

44.     In the Non-Compete Agreement, Klinger acknowledged that "any violation of the covenants contained in Sections, 2, 3, 4 or 5 of [the] Agreement would cause irreparable damages to Red Ventures, and therefore you agree that in the event of a violation of these covenants, Red Ventures shall, in addition to any other rights and remedies available to it, be entitled to an injunction enjoining and restraining you from committing any violation of this Agreement." Exhibit A, Section 6 (b).

**Award Agreement**

45.     RVOH and Klinger, by their mutual assent, also entered into an agreement, whereby RVOH agreed to provide stock options to Klinger, and Klinger, by accepting the options, agreed to comply with the restrictive covenants set forth in the equity incentive plan.

46.     On June 27, 2022, RVOH presented to Klinger an award of stock options by means of the Award Agreement and pursuant to the Ruby Lakeview JV, LLC 2022 Equity Incentive Plan

("**Plan**").

47.     The Award Agreement states, in part, "Except as otherwise set forth in this Award Agreement, the Options will be subject to all the terms and conditions contained in the Plan including, without limitation, the restrictive covenants set forth therein."

48.     Klinger electronically accepted the Award Agreement on November 8, 2022, thereby agreeing to the terms and conditions in the Plan.

49.      Article VI of the Plan contained restrictive covenants, to which Klinger was bound.

50.     The Plan was amended and restated as of March 16, 2023 as the RVO Health, LLC 2022 Equity Incentive Plan (the **"Amended Plan"**).

51.     Article 6 of the Amended Plan states as follows:

**Restrictive Covenants**. The Company and its Subsidiaries operate in a highly sensitive and competitive commercial environment. As part of their Service, the Participants will be exposed to highly confidential and sensitive information regarding the Company's and its Subsidiaries' business operations. Therefore, unless otherwise set forth in an Award Agreement, by accepting an Award each Participant agrees to be bound by the covenants set forth in this Article 6; provided that, if a Participant has an employment agreement with the Company or one of its subsidiaries that contains non- competition, non-solicitation, non-disparagement, trade secret, confidentiality and/or intellectual property covenants, then the employment agreement will control solely with respect to and to the extent of the covenants contained therein, and the Participant will be subject to the remaining covenants (if any) in this Article 6. In the event that Participant breaches any of the covenants set forth in this Article 6 or in Participant's employment agreement, as applicable, all outstanding Awards (whether vested or unvested) will terminate and be forfeited without consideration.

52.     Section 6.4 of the Amended Plan states as follows:

6.4 **Non-Compete**. During Participant's Service and for the duration of the Restricted Period (as defined below) Participant shall not, directly (or by indirect action through another person or entity that Participant directs or controls) engage in Competitive Activity on behalf of a Client or Competitor, within the United States of America.

(a)     For the purposes of this Plan, "Restricted Period" means the period of one full year (12 calendar months) following the termination of Participant's Service,

regardless of the timing, cause, or manner of termination.

(b)    For the purposes of this Plan, "<u>Competitive Activity</u>" means any employment or engagement (other than on behalf of the Company or any of its Subsidiaries) in which Participant is: (1) performing services for a Competitor or Client that are the same as or substantially similar to the job duties Participant performed for the Company during the 24 months preceding the termination of Participant's Service and (2) working for that Competitor or Client in the same or substantially similar line(s) of business(es) as Participant supported while providing services to the Company or any of its subsidiaries during the 24 months preceding the termination of Participant's Service (e.g. a business line marketing the same or substantially similar products or services as Participant marketed for the Company or any of its Subsidiaries during the 24 months preceding the termination of Participant's Service.)

***

(d)     For the purposes of this Plan, "<u>Competitor</u>" means, as determined by Company in its reasonable discretion, any business entity that: (1) competes directly with any line(s) of business(es) of the Company or any of its Subsidiaries, including but not limited to, with one or more of the Company's or any of its Subsidiaries' brands that  participant supported while providing services to the Company or any of its Subsidiaries during the 24 months preceding the termination of Participant's Service, or (2) provides services that are the same or substantially similar line(s0 of business(es), including, but not limited to, with one or more of the Company's or any of its Subsidiaries' brands, that Participant supported while providing services to the Company or any of its Subsidiaries during  24 months preceding the termination of Participant's service.

53.    The restrictions in Section 6 of the Plan are the same as those in the Amended Plan except Article 6.4 (d) of the Plan which states:

(d)      For the purposes of this Plan, "<u>Competitor</u>" means any business entity that: (1) competes directly with any line(s) of business(es) of the Company or any of its Subsidiaries, including but not limited to, with one or more of the Company's or any of its Subsidiaries' brands; or (2) competes with the Company or any of its Subsidiaries in providing services that are the same as or substantially similar to the services the Company or any of its Subsidiaries provides in the product or service lines it serves.

54.    In Section 6.8 of the Amended Plan, Klinger agreed that "(i) legal remedies (money damages) for any breach of Article 6 will be inadequate, (ii) the Company will suffer immediate and irreparable harm from any such breach, and (iii) the Company will be entitled to injunctive

relief from a court in addition to any legal remedies the Company may seek in arbitration. If an arbitrator or court determines that the Participant has breached any provision of this Article 6, Participant shall pay to the Company its reasonable costs and attorney's fees incurred in enforcing that provision."

55.     The Amended Plan is governed by Delaware law.

56.     Klinger vested in options on June 27, 2023 and June 27, 2024, thereby consenting and agreeing to abide by the terms of the Amended Plan, including its restrictive covenants.

**Separation Agreement**

57.     Following Klinger's notice of resignation, RVOH and Klinger agreed to enter into a mutually agreeable separation agreement (the "**Separation Agreement**").

58.     Klinger received a draft of the Separation Agreement from RVOH on July 1, 2024. RVOH agreed to provide a substantial amount of separation pay and other benefits expressly conditioned on Klinger's agreement to comply with his restrictive covenants in the Award Agreement and the Amended Plan, which incorporates his other restrictive covenant agreements including the Non-Compete Agreement.

59.     On August 14, 2024, Klinger signed the Separation Agreement, intending to accept the separation pay but with full knowledge that he either was already competing, or clearly intended within a matter of days to compete, against RVOH in violation of his restrictive covenants.

60.     Prior to his last day of employment by RVOH, Klinger did not inform RVOH that he had accepted a job with Everyday Health in a competitive capacity and, instead, stated he was taking time off to work on a "honey-do" list.

61.     Klinger's conduct was not in good faith and he improperly induced RVOH to enter

into the Separation Agreement under false pretenses.

**Competition between RVOH and Everyday Health**

62.     RVOH and Everyday Health are direct competitors in providing healthcare-adjacent products and services and content to on-line users including but not limited to consumers, healthcare professionals, health systems, and related advertising agencies.

63.     Everyday Health's website states it creates content on "health information and medical research," allows users to "find a doctor," and "offers a wide range of advertising opportunities from banner ads and sponsorships to affiliate programs." According to Everyday Health "[t]hese opportunities are customized to meet a particular corporation's or product's branding strategy…Revenue from advertising enables [Everyday Health] to pursue our mission to inspire people to live their healthiest lives, every day." Everyday Health Professional targets healthcare professionals and health systems.

64.     RVOH's websites similarly states it "formed to give people a better way to health & wellbeing" by providing "medically-backed information" and "the largest marketplace for finding healthcare," with Healthgrades providing sponsorships to partners and the opportunity to "advertise with Healthgrades, [so] your brand remains on patients' minds." Healthgrades Professional targets healthcare professionals and health systems.

65.     The success of RVOH's business depends upon the goodwill and trust that it has generated with consumers, clients, healthcare professionals, partnerships, brands, advertisers, and advertising agencies.

**Klinger Downloads Proprietary Information Days Before his Departure**

66.     Klinger arranged with RVOH that his last official day would be August 13, 2024, with his duties being completed and transitioned by August 9, 2024.

67.     In late July 2024, Klinger also inquired with RVOH about his restrictive covenants. Per Klinger's request, on August 5, 2024, RVOH confirmed that Klinger's equity agreements with RVOH and Red Ventures were in effect and unless he violated those agreements, including the restrictive covenants contained therein, his vested shares would not be impacted. Klinger was also explicitly advised that if he had a specific opportunity he wanted to consider, he could present it to RVOH's legal department in order to confirm that the position would not be a violation of his restrictive covenants. Notably, Klinger did not inform RVOH that planned to, or he had already accepted, a job to work at Everyday Health, which was the same business line he worked in at RVOH.

68.     On August 5, 2024, only four (4) days before his last day in the office and, upon information and belief, with full knowledge that he was or would likely be going to work for a competitor, Klinger downloaded the Proprietary Sales Tool. Also, on August 9, Klinger accessed the Patient Services and BOD Slide Outline slide decks, which contained confidential, highly sensitive information related to the top pharmaceutical companies and financial information about their spending with RVOH. Klinger was not tasked with drafting or otherwise providing input on the BOD Slide Outline slide deck. Had Klinger honestly disclosed his plans to work for a competitor, this would have obviously and significantly impacted RVOH's handling of his employment.

69.     Despite Klinger's agreement in Section 9 of the Non-Compete Agreement, Section 6.1(g) of the Amended Plan, and Paragraph 5 of the Separation Agreement to return RVOH's property upon his separation, including, but not limited to, all Confidential Information (as defined therein), credit cards, computers, or other electronic equipment, Klinger failed to return his RVOH-issued laptop computer upon the termination of his employment.

14

70.     On September 5, 2024, RVOH, through counsel, sent a letter to Klinger reminding him of his obligations under the Non-Compete Agreement, insisting that he cease competitive employment with Everyday Health, and demanding that he return the laptop computer and any other proprietary information of RVOH in his possession immediately.

71.     To date, Klinger has not personally responded to the letter, and only just returned the laptop to RVOH on September 10, 2024, which he held for 28 days after his employment ended. RVOH's investigation is ongoing. Upon information and belief, Klinger still has possession, custody, or control of RVOH's confidential and proprietary information and company property.

**RVOH's Use of Confidential Information and Trade Secrets**

72.     RVOH has acquired, developed, accumulated, and refined its business operations over the years, using proprietary, confidential and in some cases, trade secret information. RVOH incurred significant effort and expense to create one of the country's best on-line platforms to connect healthcare consumers and healthcare professionals.

73.     During his employment, Klinger learned significant information about RVOH's business, its strategies (including recent specific and targeted strategies to grow and develop its business), its processes, and its approaches to providing cutting edge, specialized, and highly effective tools to implement its products and services.

74.     RVOH and its predecessors provided Klinger with significant consideration in exchange for restrictive covenants that were intended to protect its business from the risk of potential competitive advantage a competitor could enjoy by hiring Klinger. RVOH and its predecessors would have never provided such consideration if Klinger did not agree to abide by his restrictive covenants.

**360 Marketing**

75.     "360 marketing" is a platform integration effort by RVOH to target advertisements to patients most likely to consume with healthcare professionals most likely to recommend the same products. Over the past two (2) years, RVOH has developed a highly successful and confidential process of providing 360 marketing strategy for its clients.

76.     Upon information and belief, Everyday Health does not currently have a viable 360 marketing product.

77.     Given Klinger's job duties and responsibilities during his tenure with RVOH, Klinger is closely familiar with RVOH's 360 marketing processes and techniques, and he would be able to unfairly use them for the benefit of Everyday Health in his capacity as Executive Vice President and General Manager of Everyday Health Professional unless enjoined by this Court from violating his restrictive covenants with RVOH.

78.     The Proprietary Sales Tool Klinger downloaded four (4) days before his departure is a compilation of more than a decade worth of Healthgrades' strategy, including but not limited to Healthgrades' assets and capabilities, and the DTC and HCP 360 platforms. Without the protection of Klinger's restrictive covenants, it will be unfairly leveraged by Everyday Health to compete unfairly during the restricted period, which designed to allow RVOH time to protect its legitimate business interests.

**Trade Secret Protection**

79.     RVOH's trade secrets and other confidential information are developed internally at RVOH and, therefore, they are neither generally known to the public, nor can a member of the public easily replicate them.

80.     In recognition of the importance of protecting its trade secrets and other

confidential information (particularly from a direct competitor like Everyday Health), RVOH takes a multi-layered approach to protect the secrecy of that information and to safeguard and secure access to it.

81.     Among other things, RVOH requires employees with access to its trade secrets and other confidential information to sign agreements containing confidentiality requirements and other restrictive covenants tailored to protect those trade secrets and confidential information; uses passwords to protect its internal data management systems containing trade secrets and other confidential information; limits access to its trade secrets and other confidential information to those employees who need to know the information in order to perform their roles for RVOH; implements policies regarding the access to and use of confidential and trade secret information; and provides employee training regarding controlling access to, and maintaining the security of, its confidential and trade secret information.

**Harm Caused by Klinger's Misconduct**

82.     RVOH will be irreparably harmed if Klinger continues to work for Everyday Health. Given the nature of underlying business, the competitive positions of RVOH and Everyday Health, the confidential and trade secret information about RVOH's business operations Klinger had access to and misappropriated, the relationships that Klinger developed on RVOH's behalf and at RVOH's expense with RVOH's customers, clients, advertising agencies, and partners, and the degree of overlap between Klinger's roles for RVOH and Everyday Health, Klinger cannot possibly avoid using, and has likely already used, RVOH trade secrets and other confidential information in his new role.

83.     Additionally, as the face of RVOH's products to many of the company's current and prospective clients and advertising agencies, and armed with RVOH's trade secrets and other

confidential information, Klinger is now uniquely poised to unfairly take and/or interfere with those client and advertising agency relationships.

84.     Given Klinger's refusal to comply with his contractual obligations, RVOH commenced this action to enjoin Klinger from continuing to exploit RVOH's trade secrets and other confidential information, usurping its goodwill and client and advertising agency relationships, and causing further harm to RVOH and its legitimate business interests.

<u>**Count I**</u>
<u>**Breach of Contract: Non-Compete Agreement**</u>

85.     RVOH realleges and reincorporates all the allegations contained in the preceding paragraphs as though fully set forth herein.

86.     RBUS and Klinger entered into the Non-Compete Agreement, a contractual agreement supported by good and valuable consideration, whereby RBUS agreed to hire and employ Klinger, and in exchange, Klinger agreed that he would not, among other things: (i) compete against RVOH for a period of twelve (12) months following the termination of his employment, or (ii) disclose confidential information of RVOH.

87.     Klinger has breached his contractual obligations under the Non-Compete Agreement by, among other things, engaging in Competitive Activity on behalf of a Competitor, as those terms are defined in the Non-Compete Agreement, within the United States of America; improperly downloading the Proprietary Sales Tool without the consent or authority of RVOH; refusing to return the Proprietary Sales Tool upon demand; and retaining his company laptop upon his termination of employment (particularly while working for a direct competitor).

88.     RVOH, for its part, as well as its predecessor in interest RBUS, have performed all their obligations under the Non-Compete Agreement.

89.     Klinger's breach of the Non-Compete Agreement is jeopardizing RVOH's business

and damaging RVOH in at least the following ways, in an amount to be determined at trial:

    a.    Klinger is damaging RVOH's business relationships, including relationships with its customers, prospective customers, and advertising agencies;

    b.    Klinger is impairing RVOH's goodwill;

    c.    Klinger is sharing, or in a position to share, confidential information and trade secrets of RVOH with Everyday Health that would allow it to unfairly jump ahead in the development of 360 marketing; and

    d.    Klinger is unfairly interfering with RVOH's ability to operate its business without unfair competition.

90.    The aforesaid conduct, for which there is no complete adequate remedy at law, is irreparable, continuing in nature, and will continue unless properly enjoined.

## Count II
## Breach of Contract: Award Agreement

91.    The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

92.    RVOH (fka Ruby Lakeview JV, LLC) and Klinger entered into a contractual agreement supported by good and valuable consideration in the Award Agreement.

93.    In Article 6 of the Amended Plan, Klinger agreed to comply with the covenants in his employment agreements that contained restrictive covenants, which includes the Non-Compete Agreement.

94.    Pursuant to Articles 6.1 and 6.2 of the Amended Plan, Klinger agreed to maintain the confidentiality of RVOH's confidential information.

95.    In Article 6.4 of the Amended Plan, Klinger agreed not to engage in a Competitive

Activity on behalf of a Competitor, as those terms are defined in the Non- Compete Agreement, for a period of twelve (12) months following his separation of employment from RVOH.

96.     In Article 6.1(g) of the Amended Plan, Klinger agreed to "immediately deliver" any and all property of RVOH upon the termination of his employment.

97.     Klinger breached his contractual obligations under the Amended Plan and the Award Agreement by, among other things, engaging in Competitive Activity on behalf of a Competitor; downloading the Proprietary Sales Tool without the consent or authority

98.     of RVOH; refusing to return the Proprietary Sales Tool upon demand; and retaining and failing to return his company laptop upon his termination of employment (particularly while working for a direct competitor).

99.     Klinger's breaches of the Plan, Amended Plan and the Award Agreement are damaging RVOH, in an amount to be determined at trial, including as set forth above.

100.     The aforesaid conduct, for which there is no complete adequate remedy at law, is irreparable, continuing in nature, and will continue unless properly enjoined.

**Count III**
**Breach of Contract: Separation Agreement**

101.     The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

102.     RVOH and Klinger entered into a contractual agreement supported by good and valuable consideration in the Separation Agreement.

103.     In Section 4 of his Separation Agreement, Klinger acknowledged and agreed to abide by the Award Agreement, including the restrictive covenants contained therein.

104.     The Award Agreement also requires Klinger to comply with the covenants in his employment agreements that contained restrictive covenants, which includes the Non-Compete

Agreement.

105.    In Section 5 of his Separation Agreement, Klinger contractually promised to return all RVOH property.

106.    Klinger failed to return his RVOH laptop computer upon his termination of employment, while working for a direct competitor, and he only returned it after he received a cease and desist letter.

107.    To date, Klinger has not responded to RVOH's demand for the return of Proprietary Sales Tool that he downloaded on August 5, 2024.

108.    Klinger has breached the terms of his Separation Agreement as set forth above.

109.    RVOH has been damaged in an amount to be determined at trial.

110.    The aforesaid conduct, for which there is no complete adequate remedy at law, is irreparable, continuing in nature, and will continue unless properly enjoined.

**WHEREFORE**, RVOH respectfully requests that the Court:

A.    Grant RVOH temporary, preliminary, and permanent injunctive relief to prevent Klinger, and anyone acting in active concert with him, from threatened, anticipatory, and future violation of RVOH's contractual rights;

B.    Grant RVOH an injunction, enjoining Klinger, and anyone acting in active concert with him, from engaging in Competitive Activity for a period of twelve (12) months from the last day of any breach of his restrictive covenants with RVOH;

C.    Order Klinger to return to RVOH the laptop computer, the Proprietary Sales Tool, and any other property of RVOH still in his possession, custody, or control;

D.    Monetary damages in an amount to be determined at trial;

E.    Award RVOH its costs, including reasonable attorneys' fees, court costs, witness

fees, and expenses; and

F.     Award such other and further relief as the Court deems just and equitable.


Respectfully submitted this the 30th day of September 2024.


/s/ Marc E. Gustafson
Marc E. Gustafson, N.C. State Bar No. 34429
BELL, DAVIS & PITT, P.A.
227 West Trade Street, Suite 1800
Charlotte, NC 28202
Telephone:     (704) 227-0400
Facsimile:      (704) 227-0178
Email:     mgustafson@belldavispitt.com

Shannon McDonough (MN Reg. No. 0259512)
V. John Ella (MN Reg. No. 0249282) Jamie
P. Briones (MN Reg. No. 0397624)
FAFINSKI MARK & JOHNSON, P.A.
(Applications for Pro Hac Vice to be submitted)
One Southwest Crossing
11950 Viking Drive, Suite 420
Eden Prairie, MN  55344
Telephone:  (952) 995-9500
Facsimile:  (952) 995-9577
Email:     shannon.mcdonough@fmjlaw.com
            john.ella@fmjlaw.com
            jamie.briones@fmjlaw.com

*Attorneys for Plaintiff RVO Health, LLC*